## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| MATILDA WIGGINS, | : | Case No. 3:17-cv-340 |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | Magistrate Judge Sharon L. Ovington |
| | : | (by full consent of the parties) |
| | : | |
| COMMISSIONER OF THE SOCIAL | : | |
| SECURITY ADMINISTRATION, | : | |
| | : | |
| Defendant. | : | |

## DECISION AND ENTRY

## I.      Introduction

Plaintiff Matilda Wiggins brings this case challenging the Social Security Administration's denial of her applications for period of disability, Disability Insurance Benefits, and Supplemental Security Income. She applied for benefits in March 2014, asserting that she could no longer work. The Social Security Administration denied her claims initially and upon reconsideration. After a hearing, Administrative Law Judge (ALJ) Gregory G. Kenyon concluded that Plaintiff was not eligible for benefits because she is not under a "disability" as defined in the Social Security Act.

The case is presently before the Court upon Plaintiff's Statement of Errors (Doc. #7), the Commissioner's Memorandum in Opposition (Doc. #12), Plaintiff's Reply (Doc. #13), the administrative record (Doc. #6), and the record as a whole.

Plaintiff seeks a remand of this case for payment of benefits or, at a minimum, for further proceedings. The Commissioner asks the Court to affirm ALJ Kenyon's non-disability decision.

## II.    Background

Plaintiff asserts that she has been under a "disability" since February 10, 2014. She was thirty-nine years old at that time and was therefore considered a "younger person" under Social Security Regulations. *See* 20 C.F.R. §§ 404.1563(c), 416.963(c). She has a high school education. *See id.* §§ 404.1564(b)(2), 416.964(b)(2).[1]

### A.    Plaintiff's Testimony

Plaintiff testified at the hearing before ALJ Kenyon that she has diabetes and her blood sugar is not well controlled. (Doc. #6, *PageID* #90). She takes insulin but it does not help. *Id.* When her sugar is high—which happens about three times a week—her head feels like it is going to pop and she gets migraines. *Id.*

Plaintiff has pain in her legs that feels like pins and needles are sticking into them. *Id.* at 76. On a scale from one to ten, she rated her pain at eight. *Id.* She also experiences weakness in her legs. If she stands up too fast, she gets dizzy and it feels like her legs will go out if she does not sit down. *Id.* at 75. She falls "pretty regular[ly]"— two to three times a week. *Id.* at 77. She tried to take Neurontin but it did not help. *Id.* at 75. She uses a cane when she goes out and also has a seat for her tub. *Id.* at 78. She did not have her cane at the hearing because she forgot it at her cousin's. *Id.*

---

[1] The remaining citations will identify the pertinent Disability Insurance Benefits Regulations with full knowledge of the corresponding Supplemental Security Income Regulations.

After Plaintiff fell in the bathtub, she began having midback pain. *Id.* at 73. She describes it as a sharp pain. *Id.* at 74. On a scale from one to ten, her pain is at nine. *Id.* It is aggravated when it rains a lot or if she does too much bending. *Id.* She uses a heating pad two to three times a week to help with pain. *Id.* at 74-75. She also takes Aleve about four times a week. *Id.* at 75. She tried aquatic therapy for a month; "It helped a little bit but not really." *Id.* at 90-91. Her doctor recently referred her to physical therapy again. *Id.* at 74.

Additionally, Plaintiff has numbness and tingling in her hands. *Id.* at 77. She has to hold a coffee cup in both hands because her hand is always numb and shaking. *Id.* She frequently drops things. *Id.* She also has trouble manipulating small things. *Id.* Further, she has a lot of numbness in her feet and blistering around her toes. *Id.* at 76.

Plaintiff has a lifelong history of asthma. *Id.* at 85. She uses an inhaler twice a day and a nebulizer twice a week. *Id.* She smokes half a pack of cigarettes a day. *Id.* at 86. She is trying to quit smoking but is struggling. *Id.* If she starts coughing a lot and cannot catch her breath, she goes to the emergency room. *Id.* at 91. She has gone several times for bronchitis. *Id.* She last went about two weeks before the hearing because of her breathing and because she fell. *Id.* They gave her an ankle bracelet, "a new machine to do," and a new inhaler. *Id.*

Plaintiff has had issues with rectal bleeding for a couple years. *Id.* at 83-84. She started bleeding two days before the hearing and her doctor planned to see her shortly after the hearing. *Id.* at 84. Her doctor does not know what is causing the bleeding. She is looking for a new doctor. *Id.*

Plaintiff is 5 feet, 9 inches tall and weighs 401 pounds.  *Id.* at 71.  Her primary care doctor, Dr. Obeid, recommended she have gastric bypass surgery and warned her that if she does not, "something bad could happen to [her]."  *Id.* at 92.

Plaintiff has bipolar disorder.  *Id.* at 78.  She has mood swings three times a week.  *Id.*  She has also struggled with depression since her mom passed away in 2003.  *Id.* at 79.  She has crying spells around the time of year her mom passed and during holidays.  *Id.*  She thought about suicide once but could not do that to her child.  *Id.* at 80.  She has a lot of problems because she is lonely.  *Id.*  Plaintiff has difficulty concentrating on one thing at a time.  *Id.* at 79.  For example, "I could be watching TV, and it's like I just black out.  I don't know what went on for the next little bitty minute."  *Id.* at 80.  She could not concentrate or keep up with a fast pace when she worked at a peanut factory.  *Id.* at 88.

In addition, Plaintiff has anxiety disorder.  *Id.* at 78.  She has panic attacks, especially around other people, and trouble leaving the house.  *Id.* at 81.  She only leaves three times a week—bible study on Wednesday, church on Sunday, and socializing with a neighbor.  *Id.* at 81-82.  She sometimes has "a whole lot of anxiety" about going to church but she makes herself go.  *Id.* at 82.  If she goes to the store, she hurries to get in and out.  *Id.*  She closes herself off to the world because her problems stem from being friends with the wrong kind of people and doing drugs.  *Id.* at 81.  She only sees one woman who wants to exercise with her but it is "really hard" for Plaintiff.  *Id.*

Plaintiff has a history of substance abuse.  *Id.* at 82-83.  She used cocaine and crack and drank alcohol.  *Id.* at 83.  She last used three years before the hearing.  *Id.*  She

has some criminal history associated with her substance abuse. *Id.* She once stole her cousin's TV and game system and her aunt's credit card.

Plaintiff lives in an apartment by herself. *Id.* at 72. She is able to take care of her personal needs. *Id.* at 87. On an ordinary day, she sits at home, looks at her four walls, and sometimes does word-search puzzles. *Id.* at 88. She usually spends three or four hours a day lying down, which is how she is most comfortable. *Id.* at 92. She cleans twice a week. *Id.* at 89. She can sweep the floors but has a hard time wringing out a mop. *Id.* She sometimes does laundry (although it is hard to carry the bags) and has not been cooking recently. *Id.* She does not have a driver's license because she did not pay old fines. *Id.* at 72. Plaintiff estimates that she can lift ten to fifteen pounds, stand for ten minutes, walk about five minutes, and sit for about thirty minutes. *Id.* at 85.

## B. Medical Opinions

### i. *Remon Obeid, M.D.*

Plaintiff's primary-care physician, Dr. Obeid, opined in March 2015 that she is "permanently unable to work secondary to her condition of hemorrhaging of the gastrointestinal tract." *Id.* at 738. In August 2015, he completed a Medical Impairment Questionnaire. He opined that Plaintiff can sit for fifteen minutes at one time, work for four hours per day, and lift five pounds on an occasional basis. *Id.* at 965. She cannot not stand for any period of time. *Id.* She can occasionally bend, stoop, balance, manipulate with her hands, and raise her left or right arm over shoulder level. *Id.* at 966. She needs to occasionally elevate her legs at or above her waist during an eight-hour workday. *Id.* Dr. Obeid indicated that Plaintiff experiences moderate pain. *Id.* She has

significant problems with anxiety and/or depression that markedly limit her ability to withstand the stresses and pressure of ordinary work activity. *Id.* He concluded that Plaintiff is unable to perform full-time, competitive work over a sustained basis without missing work more than two times a month or being off task more than fifteen percent of the workday due to her impairments, medical appointments, and/or treatment. *Id.*

In March 2016, Dr. Obeid completed a second Medical Impairment Questionnaire. He indicated that Plaintiff's pertinent medical history includes asthma, back pain, overweight, diabetes mellitus, hypertension, malaise, fatigue, and osteoarthritis of her knee. *Id.* at 1799. His opinions generally remained the same as his August 2015 opinions. However, he indicated that Plaintiff could stand for fifteen minutes and work for two hours per day. *Id.* Her level of pain is moderate to severe. *Id.* at 1800.

>           ii.     *Jewell Giedroyce, LPCC-S, LSW*

In March 2016, Plaintiff's counselor, Ms. Giedroyce, completed a mental impairment questionnaire. *Id.* at 1788-91. She opined that Plaintiff's bipolar disorder and anxiety "interfere with her functioning with people and a work environment." *Id.* at 1789. Her signs and symptoms include, for example, poor memory, sleep disturbance, difficulty thinking/concentrating, social withdrawal or isolation, decreased energy, and persistent irrational fears. *Id.* at 1788. Plaintiff is working to stabilize her symptoms through counseling and medication from a psychiatrist, and her prognosis is limited to fair. *Id.* at 1789. Ms. Giedroyce indicated that Plaintiff has extreme deficiencies of concentration, persistence, or pace resulting in failure to complete tasks in a timely manner. *Id.* at 1790. Further, her ability to understand and remember directions and

perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances is extremely limited. *Id*. Ms. Giedroyce concluded that Plaintiff would miss work an average of three times per month because of her mental impairments or treatment. *Id*.

### iii. Vicki Warren, Ph.D., & Bonnie Katz, Ph.D.

Dr. Warren reviewed Plaintiff's records in May 2014. *Id.* at 109-20. She found Plaintiff had four severe impairments—affective disorders, anxiety disorders, diabetes mellitus, and "osteoarthrosis and allied disorders." *Id.* at 113. She opined Plaintiff has a mild restriction of activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no repeated episodes of decompensation. *Id.* at 113-14. Further, she "can perform tasks in a relatively static setting that does not have strict production standards." *Id.* at 117.

In November 2014, Dr. Katz reviewed Plaintiff's records and affirmed Dr. Warren's assessment. *Id.* at 135-47.

### iv. Diane Manos, M.D., & William Bolz, M.D.

Dr. Manos reviewed Plaintiff's records in August 2014. *Id.* at 109-20. She opined that Plaintiff could lift and/or carry twenty pounds occasionally and ten pounds frequently. *Id.* at 115. She can stand and/or walk for six hours and sit for six hours. *Id.* She can frequently climb ramps/stairs, balance, kneel, crouch, or crawl. *Id.* at 116. She can occasionally climb ladders, ropes, and scaffolds. *Id*. Dr. Manos concluded that Plaintiff is not under a disability. *Id.* at 119-20.

In November 2014, Dr. Bolz reviewed Plaintiff's records and affirmed Dr. Manos' assessment. *Id.* at 135-47.

## III.    Standard of Review

The Social Security Administration provides Disability Insurance Benefits and Supplemental Security Income to individuals who are under a "disability," among other eligibility requirements. *Bowen v. City of New York,* 476 U.S. 467, 470 (1986); *see* 42 U.S.C. §§ 423(a)(1), 1382(a). The term "disability"—as defined by the Social Security Act—has specialized meaning of limited scope. It encompasses "any medically determinable physical or mental impairment" that precludes an applicant from performing a significant paid job—i.e., "substantial gainful activity," in Social Security lexicon. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see Bowen,* 476 U.S. at 469-70.

Judicial review of an ALJ's non-disability decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007). Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met—that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc.*

*Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)).  Substantial evidence consists of "more than a

scintilla of evidence but less than a preponderance …."  *Rogers*, 486 F.3d at 241

(citations and internal quotation marks omitted); *see Gentry*, 741 F.3d at 722.

The other line of judicial inquiry—reviewing the correctness of the ALJ's legal

criteria—may result in reversal even when the record contains substantial evidence

supporting the ALJ's factual findings.  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647,

651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746.  "[E]ven if supported by substantial

evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to

follow its own regulations and where that error prejudices a claimant on the merits or

deprives the claimant of a substantial right.'"  *Rabbers*, 582 F.3d at 651 (quoting in part

*Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47

(6th Cir. 2004)).

## IV.    <u>The ALJ's Decision</u>

As noted previously, it fell to ALJ Kenyon to evaluate the evidence connected to

Plaintiff's applications for benefits.  He did so by considering each of the five sequential

steps set forth in the Social Security Regulations.  *See* 20 C.F.R. § 404.1520.  He reached

the following main conclusions:

> Step 1:    Plaintiff has not engaged in substantial gainful employment since
> February 10, 2014.

> Step 2:    She has the severe impairments of obesity, diabetes mellitus, asthma,
> thoracic degenerative disc disease, an anxiety disorder, depression,
> and a history of polysubstance abuse.

| | |
|---|---|
| Step 3: | She does not have an impairment or combination of impairments that meets or equals the severity of one in the Commissioner's Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. |
| Step 4: | Her residual functional capacity, or the most she could do despite her impairments, *see Howard v. Comm'r of Soc. Sec*., 276 F.3d 235, 239 (6th Cir. 2002), consists of "sedentary work … subject to the following limitations: (1) occasional crouching, crawling, kneeling, stooping, balancing, and climbing of ramps and stairs; (2) no climbing of ladders, ropes or scaffolds; (3) no work around hazards, such as unprotected heights or dangerous machinery; (4) occasional use of the lower extremities for the operation of foot controls; (5) no concentrated exposure to temperature extremes or respiratory irritants; (6) limited to performing unskilled, simple, repetitive tasks; (7) occasional contact with coworkers, supervisors, and members of the general public; (8) no fast paced production work or jobs involving strict production quotas; and (9) limited to performing jobs in a relatively static work environment in which there is very little, if any, change in the job duties or the work routine from one day to the next." |
| Step 4: | She is unable to perform any of her past relevant work. |
| Step 5: | She could perform a significant number of jobs that exist in the national economy. |

(Doc. #6, *PageID* #s 41-58). These main findings led the ALJ to ultimately conclude that Plaintiff was not under a benefits-qualifying disability. *Id.* at 58.

## V.    <u>Discussion</u>

Plaintiff contends that ALJ Kenyon erred in weighing the medical opinions. She also asserts that the ALJ's findings regarding her presentation and demeanor at the hearing are unsupported and unreasonable. The Commissioner maintains that substantial evidence supports the ALJ's findings.

## A.     Medical Opinions

Social Security Regulations require ALJs to adhere to certain standards when weighing medical opinions. "Key among these is that greater deference is generally given to the opinions of treating physicians than to those of non-treating physicians, commonly known as the treating physician rule." *Rogers,* 486 F.3d at 242 (citations omitted). The rule is straightforward:

> Treating-source opinions must be given "controlling weight" if two conditions are met: (1) the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) the opinion "is not inconsistent with the other substantial evidence in [the] case record."

*Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (quoting in part 20 C.F.R. § 404.1527(c)(2)); *see Gentry*, 741 F.3d at 723.

If the treating physician's opinion is not controlling, "the ALJ, in determining how much weight is appropriate, must consider a host of factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors." *Rogers*, 486 F.3d at 242 (citing *Wilson*, 378 F.3d at 544).

The Regulations also require ALJs to provide "good reasons" for the weight placed upon a treating source's opinions. *Wilson*, 378 F.3d at 544. This mandatory "good reasons" requirement is satisfied when the ALJ provides "specific reasons for the weight placed on a treating source's medical opinions." *Id*. (quoting Soc. Sec. R. 96-2p, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996)). The goal is to make clear to

any subsequent reviewer the weight given and the reasons for that weight. *Id*. Substantial evidence must support the reasons provided by the ALJ. *Id.*

ALJ Kenyon addressed Dr. Obeid's August 2015 and March 2016 opinions together. He concluded, "Dr. Obeid's opinions are not entitled to controlling or deferential weight under the regulations, as they are not fully supported by the record." (Doc. #6, *PageID* #55). He instead assigned Dr. Obeid's opinions "little weight."

Plaintiff contends that, in requiring Dr. Obeid's opinions to be fully supported by the record, the ALJ demanded more of his opinions than the Regulations require. And Plaintiff is right, "For a medical opinion to be well-supported by medically acceptable clinical and laboratory diagnostic techniques, it is not necessary that the opinion be *fully supported* by such evidence." Soc. Sec. R. 96-2p (July 2, 1996)[2] (emphasis added).

Further, Plaintiff insists, even if Dr. Obeid's opinion is not well supported, it does not merit rejection. Plaintiff is partially correct: "Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques … means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. §§ 404.1527 and 416.927." Soc. Sec. R. 96-2P, 1996 WL 374188, at *4 (Soc. Sec. Admin. July 2, 1996).

---

[2] The Social Security Administration rescinded Soc. Sec. R. 96-2p by Federal Register Notice Vol. 82, No. 57, page 15263, effective March 27, 2017. At the time of ALJ Kenyon's decision in this case, Soc. Sec. R. 96-2p was still in effect.

However, in the present case, ALJ Kenyon did provide additional reasons for discounting Dr. Obeid's opinion.  For instance, the ALJ found, "The restrictions provided in these Questionnaires are grossly disproportionate to the level of treatment the claimant has received."  (Doc. #6, *PageID* #55).  Plaintiff contends the ALJ provided no further explanation and initially, it appears she is correct.  However, a review of the entire decision reveals he discussed her treatment in detail.  *Id.* at 48-51.  He emphasized that her primary-care physician usually treated her diabetes and back pain.  Her treatment for diabetes was mostly limited to medication and insulin (exercise and weight loss were recommended).  For her back pain, her treatment included prescription medication and a referral to physical therapy.  She saw a physical therapist but failed to return after two sessions.  The ALJ also observed that Plaintiff made a few trips to the emergency department because of the pain (along with a variety of other problems).  In September 2015, for example, she presented to the emergency room reporting that she had fallen in the shower.  *Id.* at 904.  The doctors diagnosed "back pain," prescribed hydrocodone, instructed her to ice it, and told her to follow up with her family physician.  *Id.* at 908.  After reviewing her limited treatment, ALJ Kenyon concluded, "the claimant's treatment records show a history of relatively conservative treatment along with non-compliance with treatment recommendations."  *Id.* at 48-50.  Based on the decision as a whole, substantial evidence supports the ALJ's discounting of Dr. Obeid's opinions based on the conservative care Plaintiff received.

But, Plaintiff asserts, "the ALJ fails to recognize or account for the fact that Plaintiff's ability to pursue and stick with treatment was limited by factors which had

nothing to do with the severity of her impairments, most notably her intermittent homelessness, dependence upon free clinics, and issues with transportation." (Doc. #7, *PageID* #1811) (citations omitted). This argument lacks merit. The ALJ acknowledged Plaintiff had issues with homelessness and an unstable living situation. (Doc. #6, *PageID* #52). Further, Plaintiff does not explain how her dependence on free clinics limited her ability to pursue and stick with treatment. Finally, if Plaintiff's issues substantially affected her ability to obtain treatment, there would be a lack of treatment records in general. The record shows that Plaintiff received treatment. But, as the ALJ found, those treatment records do not include objective findings that support Dr. Obeid's opinions.

Further, there is little evidence supporting Plaintiff's claim that her treatment was limited by factors other than the severity of her impairments. Plaintiff cites to only three records. (Doc. #7, *PageID* #1811) (citing Doc. #6, *PageID* #s 513, 524, 608). In March 2014, Cynthia Hites, CNP, noted that Plaintiff reported that she had not been there since January because of issues with transportation. Significantly, however, she also reported that "she now has help with a ride to get to her appointments." (Doc. #6, *PageID* #524). The other two records Plaintiff cites are from Health Partners Free Clinic. In June 2014, treatment notes indicate she was homeless and had "pending ? Medicaid." *Id.* at 608. In September 2014, the notes indicate Plaintiff lost Medicaid insurance. *Id.* at 513.

But there are other references in the record. For instance, Plaintiff testified that she tried physical therapy for "about a month" and stopped "[b]ecause I didn't have no way at the time, until I got on Medicaid, and now I can use Care Source." *Id.* at 91. Yet, as acknowledged by the ALJ, she told her physical therapist she was out of state for

family reasons. *Id.* at 50. The physical therapist noted at Plaintiff's second appointment that she should be seen once or twice a week but, because of her difficulty getting a ride, they scheduled an appointment in one week. Plaintiff did not return. *Id.* at 1484. The record does not suggest any reason for her failure to return.

Importantly, none of these notes contradict the ALJ's finding. The Commissioner, correctly observes, "[Plaintiff] does not allege or cite to evidence indicating that any further or more aggressive treatment was recommended." (Doc. #12, *PageID* #1834). In other words, the record does not reasonably suggest that Plaintiff's treatment would have changed if she was not homeless, did not depend on free clinics, or had transportation.

The ALJ discounted Dr. Obeid's opinion because he "failed to provide any objective findings or rationale for his conclusion that the claimant could not perform even sedentary work. As discussed above, Dr. Obeid's treatment records generally showed a normal gait without ambulatory aid and normal sensory examination." (Doc. #6, *PageID* #55). Plaintiff contends this reason is full of errors. First, Dr. Obeid attached medical records—including results from objective testing—to his opinion. (Doc. #7, *PageID* #1811). Second, the ALJ "cannot reasonably levy this criticism against the opinion of treating source Dr. Obeid where he elsewhere assigns greater weight to the largely unexplained opinions of the state agency's non-examining consultants." *Id.* at 1811-12. Third, "the ALJ appears to neglect Plaintiff's extreme obesity …." *Id.* at 1812.

Although Plaintiff is correct that Dr. Obeid attached treatment notes to his opinions, including results from objective testing, those notes and test results do not support Dr. Obeid's opinion. In other words, as found by the ALJ, Dr. Obeid's opinions

were "inconsistent with objective evidence showing relatively mild physical conditions and resulting limitations." (Doc. #6, *PageID* #55). For example, on February 23, 2016, Dr. Obeid saw Plaintiff and referred her to Dr. Yacoub for obstructive sleep apnea and to Dr. Hoover for an EMG of both knees. *Id.* at 1792. The EMG revealed no evidence of myopathy, radiculopathy, plexopathy, or an isolated nerve injury. *Id.* at 1795. There was evidence of a *mild* motor sensory peripheral polyneuropathy. *Id.* Plaintiff was instructed to discuss these results with Dr. Obeid. Further, an x-ray of Plaintiff's knees revealed no acute abnormality. *Id.* at 1798. Thus, while these are results from objective testing, substantial evidence supports the ALJ's conclusion that they do not support Dr. Obeid's opinions.

Further, the ALJ did not neglect Plaintiff's obesity. He acknowledged that Plaintiff was 69 inches tall, weighed 401 pounds, and had a body mass index of 59.2 at minimum. *Id.* at 43. He further considered her obesity at Step 2 when determining whether her impairments met or equaled one of the Listings. *Id.* 44-45. The ALJ explained that although there is no listing for obesity, "the Administration has recognized that obesity may be disabling in and of itself and may drastically worsen other medical conditions." *Id.* at 45 (citing Soc. Sec. R. 02-01p). Accordingly, "'if the obesity is of such a level that it results in an inability to ambulate effectively, … it may substitute for the major dysfunction of a joint(s) ….'" *Id.* (quoting Soc. Sec. R. 02-01p). ALJ Kenyon found Plaintiff was able to ambulate effectively. (Doc. #6, *PageID* #45); *see* 20 C.F.R. § 404, Subpt. P, App. 1, § 1.00B2b ("Inability to ambulate effectively means an extreme limitation of the ability to walk; *i.e.*, an impairment(s) that interferes very seriously with

the individual's ability to independently initiate, sustain, or complete activities."). Nonetheless, he limited her to sedentary work because of her obesity. (Doc. #6, *PageID* #54).

Finally, the ALJ correctly considered the State agency consultants' opinions. ALJ Kenyon assigned "moderate weight … to the extent they are consistent with the objective evidence" to the opinions of the record-reviewing physicians, Dr. Manos and Dr. Bolz. (Doc. #6, *PageID* #54). Plaintiff asserts that the ALJ failed to explain why the State agency medical consultants' opinions merited any weight whatsoever. Plaintiff's argument lacks merit. ALJ Kenyon did not merely accept Dr. Manos' and Dr. Bolz's opinions at face value. He only credited their opinions to the extent they were consistent with objective evidence. *Id.* at 54; *see* 20 C.F.R. § 404.1527(c)(4) ("Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion."). He, for example, rejected their opinion that Plaintiff could occasionally climb ladders, ropes, and scaffolds. (Doc. #6, *PageID* #47).

Further, the ALJ explained that he could not give more weight to their opinions because Plaintiff was more limited than they opined. For instance, although Dr. Manos and Dr. Bolz found Plaintiff was able to do light work, the ALJ limited Plaintiff to sedentary work because of her obesity. And, because of her back-pain complaints, the ALJ added postural limitations. Last, the ALJ acknowledged that Dr. Manos and Dr. Bolz are State agency medical consultants. Accordingly, they are "highly qualified" and experts in the Social Security disability evaluation. 20 C.F.R. § 404.1527(e)(2)(i); *see* Soc. Sec. R. 96-6p, 1996 WL 374180 ("In appropriate circumstances, opinions from State

agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating and examining sources ….").

The ALJ assigned "partial weight" to the opinions of the record-reviewing psychologists, Dr. Warren and Dr. Katz. He explained that their opinions limiting Plaintiff to work in a static setting with no strict production standards were appropriate. However, while Dr. Warren and Dr. Katz found that Plaintiff's social interaction abilities were not significantly limited, the ALJ concluded that some social functioning limitations are necessary. Accordingly, the ALJ limited Plaintiff to occasional contact with coworkers, supervisors, and members of the general public.

Plaintiff contends: "These opinions were cursory form assessments that, due to an exceedingly limited evidentiary review, failed to even contemplate let alone account for all of the severe impairments which purportedly framed the ALJ's non-disability finding." (Doc. #7, *PageID* #1814) (citations omitted). To the extent Plaintiff is contending that the ALJ found different severe impairments than the record-reviewing consultants, she is partly correct. The record-reviewing consultants found that Plaintiff had four severe impairments—affective disorders, anxiety disorders, diabetes mellitus, and osteoarthrosis and allied disorders. The ALJ found Plaintiff had those same severe impairments but used slightly different names (depression instead of affective disorder; thoracic degenerative disc disease rather than osteoarthrosis and allied disorders). However, the ALJ also found three additional severe impairments—obesity, asthma, and a history of polysubstance abuse. This does not constitute error. He did not adopt the

State agency consultants' opinions in their entirety and accounts for Plaintiff's additional impairments by adding limitations.

In summary, although Plaintiff maintains that ALJ Kenyon should have weighed the opinion evidence differently, substantial evidence supports his consideration of those opinions. *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). The substantial evidence standard presupposes that there is a zone of choice within which the decision maker can go either way, without interference by the courts. *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009). The ALJ's explanation for why he found Dr. Obeid's opinions merited little weight was within the zone of reasonable choices. Likewise, ALJ Kenyon provided a reasonable explanation, supported by substantial evidence, for how and why he weighed the opinions of the State agency consultants' opinions. Accordingly, Plaintiff's challenges to the ALJ's review of the medical source opinions lack merit.

### B.  Jewell Giedroyce's Opinion

Plaintiff asserts that ALJ Kenyon erred in weighing the opinion of her therapist, Jewell Giedroyce, PCC-S. The ALJ assigned her opinion "little weight." (Doc. #6, *PageID* #56). He correctly observed that Ms. Giedroyce is not an "acceptable medical source" under the Regulations. She instead falls under the category of "other sources." 20 C.F.R. § 404.1513(d). Evidence from "other sources" can only be used to show the severity of impairments and how it affects the claimant's ability to work. *Id.* The same factors used to evaluate medical opinions from acceptable medical sources can be applied to opinions from other sources. Soc. Sec. R. 06-03p, 2006 WL 2329939 (Soc. Sec.

Admin. Aug. 9, 2006).[3]  While an ALJ is required to weigh and provide "good reasons"

for discounting the weight given to a treating source opinion, an ALJ is not required to

explain the weight given to "other sources."  *Gayheart,* 710 F.3d at 376; Soc. Sec. R. 06-

03p, 2006 WL 2329939, at *6.

The ALJ did, however, provide reasons for assigning Ms. Giedroyce's opinion

little weight.  He discounted her opinion because she only saw Plaintiff four times.  (Doc.

#6, *PageID* #56); Soc. Sec. R. 06-03p, 2006 WL 2329939, *4 (Factors to consider

include "how frequently the source has seen the individual").  Further, although Ms.

Giedroyce found that Plaintiff had a moderate restriction of activities of daily living,

"[Plaintiff's] progress notes show generally stable moods with a high degree of daily

activities, including helping children in an after-school program."  (Doc. #6, *PageID* #s

56, 1758).  Last, the ALJ found that Ms. Giedroyce's estimated global assessment of

functioning score of 48 was inconsistent with treatment records that generally showed

scores of 60, indicating moderate symptomology.  *Id.* at 56; Soc. Sec. R. 06-03p, 2006

WL 2329939, *4 ("How consistent the opinion is with other evidence").  Because the

ALJ provided reasons, supported by substantial evidence, for discounting Ms.

Giedroyce's opinion, Plaintiff's argument lacks merit.

### C.     Plaintiff's Presentation and Demeanor

The Social Security Administration uses a two-step process for evaluating an

---

[3] Soc. Sec. R. 06-03p was rescinded by Federal Register Notice Vol. 82, No. 57, page 15263, effective March 27, 2017.  At the time of ALJ Kenyon's decision in this case, Soc. Sec. R. 06-03p was still in effect.

individual's symptoms. First, the ALJ determines whether an individual has a medically

determinable impairment that could reasonably be expected to produce the individual's

alleged symptoms. Soc. Sec. R. 16-3p, 2016 WL 1119029, *3 (March 16, 2016).[4]

Second, the ALJ evaluates the intensity and persistence of the individual's symptoms and

determines the extent to which the individual's symptoms limit her ability to perform

work-related activities. *Id.* at *4. To do this, the ALJ must examine the entire case

record, including the objective medical evidence; the individual's relevant statements;

statements and other information provided by medical sources and others; and any other

relevant evidence in the record. *Id*. The ALJ should also consider several factors:

> 1. Daily activities;
> 2. The location, duration, frequency, and intensity of pain or other symptoms;
> 3. Factors that precipitate and aggravate the symptoms;
> 4. The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;
> 5. Treatment, other than medication, an individual receives or has received for relief of pain or other symptoms;
> 6. Any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
> 7. Any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.

*Id.* at *7; *see also* 20 C.F.R. § 404.1529(c)(3).

---

[4] The Social Security Administration republished Soc. Sec. R. 16-3p on October 25, 2017 to clarify that its adjudicators will apply Soc. Sec. R. 16-3p when they make determinations and decisions on or after March 28, 2016. 2017 WL 5180304 (Soc. Sec. Admin. Oct. 25, 2017). At the time of ALJ Kenyon's decision in the present case, the first publication of Soc. Sec. R. 16-3p was in effect.

In the present case, ALJ Kenyon found that Plaintiff had several impairments that could reasonably be expected to produce her symptoms. However, he found that Plaintiff's statements regarding the intensity, persistence, and limiting effects were not entirely credible for several reasons.

Plaintiff asserts the ALJ erred in finding that her presentation and demeanor were inconsistent with her allegations of disabling symptoms. Specifically, the ALJ observed, "The claimant closely and fully attended the hearing proceedings. She sat throughout the entire hearing, appeared to have no difficulty sitting or rising, and did not appear to be in pain or any other distress. The claimant also attended the hearing without the use of an ambulation aid." (Doc. #6, *PageID* #54).

The ALJ did not err in considering his observations of Plaintiff at the hearing. *See* Soc. Sec. R. 16-3p, 2016 WL 1119029, *7 ("The adjudicator will consider any personal observations of the individual in terms of how consistent those observations are with the individual's statements about his or her symptoms as well as with all of the evidence in the file.").

Plaintiff asserts that she never endorsed using the cane all of the time, and she explained that she did not have it at the hearing because she forgot it at her cousin's. (Doc. #7, *PageID* #1817). Specifically, she testified, "I have a cane that I use when I go out." (Doc. #6, *PageID* #78). Regardless of where the cane was, its absence undermines Plaintiff's allegations about the limiting nature of her impairments. Further, her ability to walk without it is consistent with treatment notes indicating she had a normal gait without an ambulatory aid.

Plaintiff is correct that her ability to attend a forty-two-minute hearing does not establish that she is able to work a fulltime job or that she is not in pain. However, it is not consistent with her statements at the hearing. Plaintiff testified that she can sit for thirty minutes "[a]nd then that's when the numbness overrides." *Id.* at 85. Similarly, she said that she could not pay attention during a half-hour TV show. *Id.* at 80. Yet, she was able to sit and maintain focus during the hearing.

Further, to the extent the ALJ erred, any error is harmless because it is only a small part of the ALJ's consideration of Plaintiff's subjective symptoms. He provided several other reasons for discounting her subjective allegations. For instance, ALJ Kenyon noted that objective evidence does not support Plaintiff's claim that she is unable to work. As discussed above, he pointed out that Plaintiff has a history of relatively conservative treatment and non-compliance with treatment recommendations. *See* Doc. #6; *PageID* #s 48-50.

ALJ Kenyon also discussed Plaintiff's complaints of disabling mental-health symptoms, concluding that objective evidence failed to support the level of limitation that Plaintiff alleged. *Id.* at 51- 53. He acknowledged that her treatment was extensive but found that her mood difficulties, anxiety, and depression were managed well by her medications. *Id.* at 51.

The ALJ also considered that Plaintiff worked part-time about one month after her alleged onset date and reported that it made her feel better. *Id.* at 53. He noted that although she did not continue to work, the record does not reveal any significant worsening of her physical or mental conditions around the date of her alleged onset date

or immediately thereafter.  He concluded, "it is reasonable to infer that [Plaintiff's] lack of employment is not necessarily due to any disabling impairments, but could be a matter of choice, at least to some extent."  *Id.* at 54.

ALJ Kenyon considered Plaintiff's activities of daily living.  He observed that despite her pain, she remained active.  (Doc. #6, *PageID* #45).  She attended church and Bible study, volunteered at an after-school program, performed household chores, and maintained personal hygiene.  *Id.* at 45-46, 53 (citations omitted).

In sum, ALJ Kenyon evaluated Plaintiff's symptom severity as set for in the Regulations and Social Security Ruling 16-3p.  He reasonably weighed the evidence and concluded Plaintiff is not under a disability.  Substantial evidence supports his conclusions.  Accordingly, Plaintiff's challenges to the ALJ's symptom-severity determination lack merit.

For the above reasons, Plaintiff's Statement of Errors lacks merit.

## IT IS THEREFORE ORDERED THAT:

1.      The ALJ's non-disability decision is affirmed; and

2.      The case is terminated on the Court's docket.

August 6, 2019                                        *s/Sharon L. Ovington*
                                                     Sharon L. Ovington
                                                     United States Magistrate Judge